IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

H.J. HEINZ COMPANY,

          Plaintiff,                  15cv0631

                                        **ELECTRONICALLY FILED**

             v.

STARR SURPLUS LINES INSURANCE
COMPANY,

          Defendant.

<u>**Memorandum Opinion Setting Forth Findings of Fact and Conclusions of Law
on "Phase One" – Counterclaim for Rescission**</u>

## I.    INTRODUCTION

This case involves an insurance coverage dispute between Plaintiff/Counterclaim-Defendant H.J. Heinz Company ("Heinz") and Defendant/Counterclaim-Plaintiff Starr Surplus Lines Insurance Company ("Starr"). The Court, working with the excellent trial counsel of both parties early in the case, established a decision-making model so that the issues in the case could be decided in an orderly and efficient manner and, to that end, the Court conducted a jury trial from December 14, 2015 through December 16, 2015 on Starr's Counterclaim for Rescission of the insurance policy, which the Court has referred to as "Phase One" of this matter. *See* 7/14/2015 Minute Entry and Doc. No. 125.

The Counterclaim seeks the equitable relief of rescission of the insurance policy, and thus the final determination of that claim is one for the Court, even though the Court decided to employ an advisory jury after consultation with counsel. Through pretrial documents and working with counsel, the Court originally drafted the version of the jury verdict slip at

doc. no. 241, but after hearing all of the evidence in this case, immediately prior to charging the

advisory jury, this Court amended the verdict slip at doc. no. 265, to reflect the evidence

presented at trial, which read as follows:

**A.      Starr's Claim/Cause of Action - Rescission**

1.      Did Starr prove by a preponderance of the evidence that Heinz made a misrepresentation
of fact(s) in its insurance application which was material?

_____            _____
Yes                       No

        Please proceed to question 2.

2.      Did Starr prove by clear and convincing evidence that, during the insurance application
process, Heinz deliberately omitted information and/or deliberately remained silent on
information that Heinz knew would be material to Starr?

_____            _____
Yes                       No

        If you answered "Yes" to question 1 or 2 or both, please proceed to question 3.  If you
answered "No" to question 1 and 2, skip question 3 and please sign verdict slip.


**B.      Heinz's Affirmative Defenses**

3.      Did Heinz prove by a preponderance of the evidence that Starr waived the right to assert
a rescission claim by: (1) agreeing to sell the Policy despite sufficient knowledge of the
misrepresentation/omitted information/silence; or (2) failing to promptly assert rescission of the
Policy after gaining sufficient knowledge of the grounds for rescission, and after a reasonable
period of time in which to investigate all of the facts surrounding the potential basis for
rescission and to deliberately decide whether it should rescind the Policy?

_____            _____
Yes                        No


        The advisory jury answered "yes" to question number one (1), "no" to question number

two (2), and "yes" to question number three (3).  Doc. No. 275.  The Court agrees with the

findings of the advisory jury on questions numbers one (1) and two (2) and departs from the

advisory jury on only question number three (3), as this Court, after hearing the evidence and observing the demeanor of the witnesses and measuring their credibility/believability, guided by the appearance and conduct of the witnesses, by the manner in which the witnesses testified, by the character of the testimony given, and by evidence of testimony to the contrary,[1] finds that the evidence does not support a finding of "yes" on question number three (3).

## II. DISCUSSION

### A. Law on Advisory Jury[2]

In *Mercantile & General Reinsurance Co., PLC v. Colonial Assurance Co.*, 82 N.Y.2d 248 (1993), the Court of Appeals of New York addressed the use of an advisory jury in a similar case:

> Under the plain terms of CPLR 4101, when a legal claim is met with an equitable defense or counterclaim, "the issues of fact shall be tried by a jury . . . except that equitable defenses and equitable counterclaims shall be tried by the court." (*see also*, NY Const. art. I, § 2). Following that direction, the jury could and did fully decide the disputed issues of fact necessary to the claim of contractual breach . . . **At that point, the sole unresolved issue was whether the contract should be declared void from its inception because of material misrepresentation. All issues pertaining to that equitable defense and counterclaim, whether matters of fact or of law, were to be determined by the court under CPLR 4101.**

82 N.Y.2d at 252-53 (emphasis added).

---

[1] Throughout this Memorandum Opinion, when this Court refers to "credibility" determinations, and/or statements regarding "demeanor" of the witnesses, the Court has carefully scrutinized all of the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. In doing so, the Court has also considered the following: each witness' intelligence, motive, state of mind, and demeanor or manner while on the stand; the witness' ability to have observed the matters as to which he or she testified, and whether he or she impressed the Court as having an accurate recollection of these matters; any business, personal or other relationship a witness might have had with either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness was either supported or contradicted by other evidence in the case.

[2] By Memorandum Order of July 31, 2015, the Court determined that the substantive law of the State of New York applies to this dispute. Doc. No. 73.

Moreover, the Court of Appeals of New York stated as follows: "[B]ecause the jury verdict on misrepresentation was merely advisory, the trial court was not bound by it. It could disregard the advisory verdict, even if there was evidence to support it (*see, McClave v Gibb,* 157 N.Y. 413; *Ruder v Lincoln Rochester Trust Co.,* 18 A.D.2d 763)." *Id.* at 253.

This Court, on the underlying equitable Counterclaim for Rescission, makes the following Findings of Fact and Conclusions of Law:

### B. Question Number One (1) of the Verdict Slip

Section 3105 of New York's Insurance Law sets forth the basic framework for rescission. N.Y. Ins. Law § 3105. It states in relevant part that:

> No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless such misrepresentation was material.

*Id.* at § 3105(b)(1). As this Court previously ruled, New York case law instructs that both intentional *and* unintentional misrepresentations will void a contract of insurance if the misrepresentation is material. *See* Memorandum Order re: Parties' Proposed Verdict Slips and Jury Instructions, Doc. No. 125. *See also Matter of Liquidation of Union Indem. Ins. Co. of New York*, 674 N.E.2d 313, 320 (N.Y. 1996) (specific intent is not required to rescind an insurance policy; even "an innocent failure to disclose a material fact is sufficient") (citation omitted); *Mutual Ben. Life Ins. Co. v. JMR Electronics Corp.*, 848 F.2d 30, 32 (2d Cir. 1988) (even an innocent misrepresentation will allow rescission).

After hearing the testimony at trial,[3] observing the demeanor of the witnesses, judging their credibility, and examining all of the evidence, the Court rules that Starr has proven by a

_____

[3] Throughout this Memorandum Opinion, the Court will reference Doc. Nos. 283, 284 and 285, which constitute the complete Trial Transcript of this matter.

4

preponderance of the evidence that Heinz made material misrepresentations of fact in its answers to Questions 6e[4] and 11a[5] of its insurance Application.[6]

### C. Starr Underwriters Credibly Explained Why the Misrepresentations Were Material

Starr underwriter Jill Peev had 8 years of experience in underwriting in contamination insurance policies, and Christian Waeldner, to whom she reported, had 15 years of experience doing the same. They both credibly testified to support a finding that the following misrepresentations by Heinz were material, meaning that had the underwriters known of these misrepresentations, they would have declined to issue the same or substantially the same policy on the same terms:[7]

---

[4] At Joint Exhibit J-10, Question 6e asked:
Has the Applicant, its premises, products or processes been the subject of recommendations or complaints made by any regulatory body, internal or third party audit over the past 12 months or have any fines or penalties been assessed against the Applicant by any food or similar regulatory body over the last 3 years? If YES, please provide details as well as remedial action completed.

Heinz answered "no" to this question.

[5] At Joint Exhibit – J-10, Question 11a asked:
In the last 10 years has the Applicant experienced a withdrawal, recall or stock recovery of any products or has the Applicant been responsible for the costs incurred by a third party in recalling or withdrawing any products, whether or not Insured or Insurable under an accidental and malicious contamination policy? If YES, please complete the attached supplementary loss information sheet.

Heinz did not answer this question. In the cover email, Heinz insurance broker Aon stated: "We will provide updated lost information under separate cover." On June 6, 2014, Aon sent another XL Insurance form which was signed by Ian Ascher, Heinz's Global Insurance Director, on May 28, 2014, which included a spreadsheet of recall losses from 1998 to 2013.

[6] Although Heinz's Application to Starr was made on an XL "generic" Application, the form was not materially different from Starr's own Application. Doc. No. 283 at 64-65. *Compare* XL Application (J-10) and Starr Application (J-12).

[7] Additionally, both experts acknowledged and conceded that the greater the number of historic losses that "penetrate" the insurer's proposed attachment point (herein losses above the self-insured retention (SIR)) (see *infra* FN8), the more important the matter becomes to an underwriter's judgment. Doc. No. 284 at 76-77 and 148-149. Furthermore, Ms. Peev explained that quality control information "goes hand in

(1) The January 2014 China Nitrite Loss, wherein Chinese Government food safety agents detected that Heinz baby cereal products were contaminated with levels of Nitrite that exceeded the limit imposed by Chinese law, which prompted Heinz to conduct a "silent recall." Heinz eventually destroyed 245,000 pounds of product, and the loss was $11-12 million. This loss was intentionally not disclosed to Starr or other prospective insurers on the purported basis (according to Mr. Ascher) that the loss would *not* have been covered by a Contaminated Products Insurance (CPI) policy.[8] Doc. No. 283 at 193-194. The Court notes, however, that Application Question 11a sought the disclosure of all withdrawals, recall and stock recoveries "whether or not insured or insurable under" a CPI policy. J-10. And, regardless of Question 11a, these events should have triggered a "yes" to Question 6e - - which broadly asked about government regulatory issues.

(2) The 2013 China Mercury Loss, wherein Heinz's tuna-based baby food was contaminated with Mercury, the product was recalled, and Heinz was fined in July of 2013 by the Chinese Government. In Heinz's response to Question 6e, Heinz represented that it had not been fined by a governmental agency in the last three years, which was false. J-10.

(3) The 2008 Listeria Loss, wherein Heinz's San Diego facility was found by the United States Department of Agriculture to be contaminated with Listeria, resulting in a loss of at least $12.7 million. Doc. No. 283 at 261; J-51. Although the Listeria event was provided to Starr, the

---

hand" with losses, and are "quite serious," in that fines and penalties "can indicate" institutional weaknesses in the insured's operations. Doc. No. 284 at 19.

[8] The Starr Policy affords what is called "Product Contamination Insurance" ("CPI"), which includes Accidental Contamination ("ACI"), Government Recall, Products Extortion and Malicious Product Tampering Insurance. Doc. No. 284 at 40. The instant dispute involves the Accidental Contamination and Government Recall (ACI) portions of the Policy. *Id.* At trial, the parties used the terms CPI and ACI to refer to the type of insurance policy Heinz was seeking and ultimately purchased in 2014. Doc. No. 283 at 265. Prior to 2013, Heinz had an ACI policy, subject to a $20 million self-insured retention. Doc. No. 283 at 173-174. A self-insured retention (SIR) is the amount of the loss that the policyholder has to retain before the insurance company will begin to pay the loss. Doc. No. 283 at 52.

associated loss amount was listed as a dash ("-"), which the testimony established denoted as a "$0 loss."  J-10 at STARR0003878.XLS, line AC-44; Doc. No. 283 at 92 and 186; Doc. No. 294 at 89 (Starr witnesses as well as Mr. Ascher acknowledged that the dash meant a "null" or "0" loss).  Also, prior versions of the loss history by Aon to Heinz correctly disclosed a $12.7 million loss, but those versions were never provided to Starr.

Mr. Ascher testified that he purposefully removed this information from the "updated" loss history that Heinz submitted to insurers based upon his belief that the loss was not covered by an ACI Policy because no product had been contaminated with Listeria.  Doc. No. 283 at 187.  Question 11a does not so limit the requested information and instead required the disclosure of losses "whether or not insured or insurable."  In any event, Mr. Ascher's predecessor at Heinz had previously determined that the Listeria loss was a covered loss, and the loss would have been covered by an ACI Policy.  Doc. No. 283 at 261, J-51.

(4)  Other smaller losses in 2014, including one in Canada and two in New Zealand, were not disclosed.  Heinz contended those losses were disclosed but offered no credible evidence of disclosure.

Alex Pittignano, Senior Vice-President at Starr, responsible for four divisions including crisis management, environmental liabilities, political risk and commercial casualty, who reviewed the underwriting charts and recommendations of Ms. Peev and Mr. Waeldner, testified credibly that these misrepresentations were material.[9]

Heinz took the position that Mr. Ascher made *no* material misrepresentations of fact during the application process.  However, his testimony, combined with the testimony of Starr's other witnesses, told a different story.

---

[9] More detailed Findings of Fact follow at Section III.

Mr. Ascher, a sophisticated business person in an executive position at Heinz, was responsible for completing and signing/certifying the Insurance Application pursuant to his newly acquired role as Global Insurance Director. The undisputed evidence revealed that Heinz had a form of Product Contamination Insurance prior to 2013, subject to a $20 million self-insured retention (SIR) (see *supra*, FN8), but Mr. Ascher knew that the new Heinz senior management did not continue coverage as part of a cost-reduction measure. After Mr. Ascher was hired, he recommended to Heinz senior management that Heinz obtain this coverage again -- but he needed a lower SIR and/or a lower premium in order to gain the support of Heinz senior management. Thus, on behalf of Heinz, Mr. Ascher, who considered himself to be an "expert" on matters relating to insurance, sought proposals to achieve his goal of a lower SIR ($5 million or less) and a lower premium.[10] Doc. No. 283 at 173-175. The trial evidence established that his goal would *not* have been achieved if he had provided to Starr the same information he provided to Heinz senior management -- namely the misrepresentations described above. See J-37.

The Court finds that Mr. Ascher's testimony to the effect that he was relatively new at his job, that he did not believe that the information he failed to include at Question 11a or answered falsely at Question 6e, would be "material," and that he relied upon Aon, Heinz's insurance broker,[11] to complete the missing parts of the Application for him, was not credible. The Court instead finds that Mr. Ascher, a sophisticated business person and insurance "expert," misrepresented information on the Application for one or both of the following reasons: (1) to obtain a lower Self Insured Retention (SIR) ($5 million instead of $10 or $20 million) and/or (2)

---

[10] Heinz considered purchasing ACI with a lower SIR of $1 million, $5 million or $10 million. Doc. No. 283 at 175.

[11] A misrepresentation made by a broker is imputed to an insured (Heinz). *Bloom v. Mutual of Omaha Ins. Co.*, 161 A.D.2d 1047, 1049 (N.Y. App. Div. 3d Dept. 1990).

to secure a lower insurance premium. Additionally, he signed a Certification, on behalf of Heinz, that the statements in its Application were "true" and that "no material information has been withheld," knowing that his Certification was intentionally false. J-10.

Although the case law instructs that a misrepresentation may be either intentional or unintentional, credible testimony and documentary evidence supports the finding that Heinz intentionally made misrepresentations.[12] For example, Mr. Ascher included the undisclosed recalls on the chart (J-37) that he prepared for the Heinz senior management meeting wherein the need for a certain (lower) SIR was discussed. Simply put, if this information was sufficiently important for Mr. Ascher to include in a presentation memorandum to the Heinz senior management, it was sufficiently important to include on the Application, yet Mr. Ascher failed to do so.[13] Therefore, the Court agrees with the finding of the advisory jury on question number one (1) - - that Starr has proven by a preponderance of the evidence that Heinz made material misrepresentations of fact during the application process.

### D. Question Number Two (2) of the Verdict Slip

An insured has no duty under New York law to volunteer information which has not been requested, and nondisclosure of such information will only void an insurance policy in instances where the insured sought to defraud the insurer by failing to disclose the information. *See* Doc.

---

[12] Earlier in this litigation, the parties and the Court devoted substantial time and effort to the issue of whether the law of New York or Pennsylvania applies to this dispute. See Doc. Nos. 61-70 and 73. The standard for rescission under Pennsylvania law requires that the insured made a false representation that was *knowingly* made, or was made in bad faith, and that the representation was material to the risk being insured. Under Pennsylvania law, the insurer bears the burden to prove all three elements by clear and convincing evidence. *Justofin v. Metro. Life Ins. Co.,* 372 F.3d 517, 521 (3d Cir. 2004). Whereas here, under New York law, Starr has a lesser burden for certain of the misrepresentations (preponderance of the evidence at question one (1)) and may rescind the policy regardless of the insured's knowledge (intentional and unintentional misrepresentations are both actionable). If the law of Pennsylvania was applicable, since the Court finds that Heinz made intentional misrepresentations of fact, even under a clear and convincing standard (see FN 14), Starr's Counterclaim for Rescission would still be successful.

[13] This evidence also supports the finding established by Starr's underwriters' testimony that the information misrepresented was material to Starr's decision to sell the policy.

No. 125 at p. 4-5, *citing DiDonna v. State Farm Mut. Auto Ins. Co.*, 687 N.Y.S.2d 175, 176 (N.Y. App. Div. 2d Dept. 1999). On this issue, the Court sided with Heinz and employed the "clear and convincing standard," in conformance with insurance fraud cases in New York. *See* 69 N.Y. Jur. 2d Insurance § 1212; *cf.* N.Y. PJI 3:20 (requiring clear and convincing evidence to prove fraud generally) and N.Y. PJI 4:80A (requiring clear and convincing evidence to prove fraudulent misrepresentation or false swearing in fire insurance cases).

The advisory jury answered "no" to question two (2) as to whether Starr proved by clear and convincing evidence that Heinz deliberately omitted information and/or deliberately remained silent during the application process with respect to information Heinz knew would be material to Starr. Again, although the Court finds that Heinz intentionally omitted certain information under the preponderance of evidence standard, under the "clear and convincing" burden, which requires a higher standard of proof, the Court will not disturb the findings of the advisory jury.[14]

### E.  Question Number Three (3) of the Verdict Slip

Prior to the trial, the Court, with input from the parties, drafted the following verdict slip question on Heinz's affirmative defenses:

> 3.  Did Heinz prove by a preponderance of the evidence that Starr waived the right to assert a rescission claim by doing any one of the following: (1) agreeing to sell the Policy despite sufficient knowledge of the misrepresentation/omitted

---

[14] Because New York law employs different burdens of proof depending upon whether the information in the answer is false or whether the information is omitted and was not specifically requested, the Court drafted the jury instructions accordingly. The Court has no reason to disturb the findings of the jury on question number two (2). However, the Court has found Heinz's actions to be intentional, and therefore, even under a "clear and convincing" burden of proof, Starr's evidence would pass muster.

Moreover, several of Heinz's misrepresentations cannot be considered "omissions" as a matter of law to trigger this higher burden of proof. Starr has easily proven by a preponderance of evidence that Heinz's answer to Question 6e was false and its answer to Question 11a contained misrepresentations of fact. Those answers were not "omissions." The Court will not elaborate further because this determination would not alter the overall outcome of the case.

information/silence; (2) accepting premiums from Heinz after Starr had sufficient knowledge of grounds for rescission; (3) failing to promptly assert rescission of the Policy after gaining sufficient knowledge of the grounds for rescission, and after a reasonable period of time in which to investigate all of the facts surrounding the potential basis for rescission and to deliberately decide whether it should rescind the Policy; or (4) seeking to enforce Policy provisions or otherwise acting in a manner inconsistent with an intent to rescind the Policy after Starr had sufficient knowledge of the grounds for rescission?

Doc. No. 241.

However, as set forth above, after hearing the evidence at trial, the Court found that the evidence did not warrant subparts two (2) and four (4), and therefore eliminated those questions from the verdict slip. The following question went to the advisory jury:

3. Did Heinz prove by a preponderance of the evidence that Starr waived the right to assert a rescission claim by: (1) agreeing to sell the Policy despite sufficient knowledge of the misrepresentation/omitted information/silence; or (2) failing to promptly assert rescission of the Policy after gaining sufficient knowledge of the grounds for rescission, and after a reasonable period of time in which to investigate all of the facts surrounding the potential basis for rescission and to deliberately decide whether it should rescind the Policy?

Doc. No. 265.

The jury answered "yes" to the above question. Doc. No. 275. The Court respectfully reaches the opposite conclusion.

**(1) Part One (1) – Starr Lacked "Sufficient Knowledge"**

As to part one (1) of question number three (3), whether Starr waived its right to assert a rescission claim because Starr had sufficient knowledge of a misrepresentation or omission yet agreed to sell the policy, the law places the burden on Heinz to show that Starr either had actual knowledge of the facts misrepresented or that it had been given information that was "sufficiently indicative of something more to be tantamount to notice of the unrevealed." *Friedman v. Prudential Life Ins. Co. of America*, 589 F. Supp. 1017, 1024 (S.D.N.Y 1984).

Mere negligence by the insurer is not sufficient. *Id.* ("Even if the defendant was negligent in some degree . . . in not making further inquiry, that is not the equivalent of knowledge nor does it cancel out or counteract the insured's fraud.") (internal citation omitted).

The advisory jury was instructed in conformance with the law as follows: "[S]ufficient knowledge is obtained when the information known to the insurance company would have led a reasonably prudent insurer to inquire about the matter. . . . You must determine whether Starr acted reasonably in relying on the alleged misrepresentation or whether Starr had a duty to investigate further based upon the alleged incomplete or imperfect information that it had." Doc. No. 266.

After hearing the testimony and observing the demeanor of the witnesses, the Court departs from the jury on this point. While Starr was not "perfect" in its assessment and underwriting practices, perfection is not the standard. Instead, this Court finds that Starr acted more than reasonably under the circumstances. Specifically, the Court finds that Starr's expert was credible, and that Starr underwriters lacked sufficient knowledge of Heinz's misrepresentations or omissions.[15]

Specifically, the Court finds that Starr did not have such "sufficient knowledge," as Heinz argued, because of certain information in a prior application for a different type of insurance policy, or because a newspaper article discussing the undisclosed incidents was contained in Starr's underwriting files, as asserted by Heinz's expert and witnesses. These items, without more, would not trigger a reasonably prudent insurer to follow-up further. Instead, based upon the credibility of the witnesses, Starr's underwriters acted professionally and

---

[15] Notably the evidence revealed that four (4) out of five (5) prospective insurers who quoted Heinz ACI insurance did not request additional loss information. See J-27. This fact illustrates the point that the information provided was not "sufficiently indicative of something more," to place the (potential) insurer(s) on "notice of the unrevealed."

prudently, and they should not have been expected to look at an application for a different type of insurance submitted at some other time, or to independently verify the entries on Heinz's loss history, or to determine whether, at some point in history, Heinz disclosed something about one of the listed losses that might have prompted further inquiry, in order to properly assess the risk. The information provided by Heinz to Starr under these circumstances was not "sufficiently indicative of something more to be tantamount to notice of the unrevealed." *Friedman,* 589 F. Supp. at 1024.[16]

### (2) Part Two (2) – Starr Acted Promptly

As for part two (2) of question number three (3), "whether Starr failed to promptly assert rescission of the Policy after gaining sufficient knowledge of the grounds for rescission, and after a reasonable period of time in which to investigate all of the facts surrounding the potential basis for rescission and to deliberately decide whether it should rescind the Policy," the Court finds that there was no credible evidence to support a finding that Starr failed to acted promptly.

In fact, there was no credible evidence to support Heinz's theory of "post-claim underwriting." Heinz's expert, D. Bendure, an expert in the field of insurance, could not apply his broad opinions about insurance underwriting and claims processing to the facts of this case. Instead, he spoke in generalities regarding undisclosed losses above an SIR and its effect on underwriting. Doc. No. 284 at 130-151.

Additionally, the credible testimony of Louise Ann Kelleher, of Starr Adjustment Services, Inc., who was involved in this case pursuant to her employment as a supervisor of all Starr claims managers during the period at issue, established that Starr acted promptly and

---

[16] Heinz argued that the loss history spreadsheet submitted for Question 11a included a notation specifically limiting the answer to losses "as of" May 2013. Assuming for sake of argument that this could have prompted a potential for follow-up by Starr, it does not eliminate or excuse Heinz's false answer to Question 6e - - which would not lead a reasonably prudent insurer to ask if the answer was truthful.

reasonably. Starr hired RGL and Charles Taylor in the fall of 2014 to investigate Heinz's claim for coverage under the policy. Ms. Kelleher only became aware of the China Nitrite incident at an April 20, 2015 meeting with RGL. Her May 11, 2015 letter to Heinz sought information that had been previously requested and not provided by Heinz, and she posed questions about the newly discovered China Nitrite issue and why it was not disclosed in Heinz's Application. J-106. By email sent at approximately 4:14 p.m. on May 14, 2015, Ms. Kelleher again asked Heinz why it had not disclosed the China Nitrite loss in its Application. Heinz did not respond. Doc. No. 284 at 110-112; J-123. Instead, at approximately 4:46 p.m. on May 14, 2015, Heinz commenced this action, therefore suing Starr before the claim process relating to a China lead contamination loss could be completed. Doc. No. 1. On June 16, 2015, Starr asserted its Counterclaim for Rescission.[17] Doc. No. 284 at 114; J-33.

Judging Ms. Kelleher's testimony, and observing her demeanor, the Court finds that her testimony is worthy of credence. The undisputed evidence was that, despite having approximately 2,500 claims on policies for which Starr had paid approximately $190 million in claims, Starr had not previously sought to rescind *any* policy. Doc. No. 284, pp. 113-114. This evidence inures to the benefit of Starr.

Again, there was no credible evidence that Starr had unreasonably delayed in seeking rescission. Rather, the evidence reveals that at the time that Heinz brought suit against Starr, Starr was properly and deliberately engaged in the process of evaluating Heinz's claim for coverage under the policy. The documentary evidence submitted during Ms. Kelleher's testimony amply supports this Court's finding that the claims adjusters were in the middle of a proper evaluation process when Heinz filed suit. In her May 11, 2015 letter to Mr. Ascher, Ms.

---

[17] Here, it would appear that Heinz forced Starr's hand, as Starr had no choice but to file a Counterclaim. F.R.C.P. 13 (compulsory Counterclaim must be filed with Defendant's answer).

Kelleher politely asked legitimate questions of Heinz as part of her job as a leader of claims (see J-117), and her testimony established it was not Starr's intent to rescind the policy, as the evidence demonstrates that Starr in fact desired Heinz as a long-term client.  Doc. No. 284 at 109; Doc. No. 283 at 322.  Heinz, therefore, failed to meet its burden to show that Starr did not act promptly to rescind the policy under these circumstances.

## III.  ADDITIONAL FINDINGS OF FACT

### A.  Joining of the Issue of Rescission

1.  Starr Surplus Lines Insurance Company ("Starr") sold an Accidental Contamination and Government Recall insurance policy ("ACI policy") to Heinz for the period July 1, 2014 to July 1, 2015.  J-30.

2.  In August 2014, Heinz sought coverage under the ACI policy for losses it incurred in connection with a product recall in China.  J-158.

3.  Starr refused to pay Heinz's Claim and seeks to rescind the Policy.  J-158.

### B.  The Parties

4.  Heinz makes and sells food products on a worldwide basis.  Starr is a global insurance company.  Doc. No. 234 ¶ ¶ 1-2.  Starr sells Contaminated Product Insurance ("CPI"), including ACI which protects food product companies against certain types of losses arising from the accidental contamination and governmental recall of their products.[18]

---

[18] The Parties' Joint "Nature of the Case," which was read to the jury, states as follows: "Heinz makes and sells food products on a worldwide basis. Starr is an insurance company that provides product contamination insurance. Product contamination insurance protects companies from certain types of losses that they may suffer if a product is contaminated.  Heinz submitted an application to Starr for product contamination insurance in June 2014.  Starr then provided a product contamination insurance policy to Heinz that covered the period from July 1, 2014, to July 1, 2015.  Starr alleges that Heinz failed to disclose or misrepresented certain material information in its application for insurance.  Starr alleges that it relied on Heinz's statements in its insurance application when it decided to sell the Policy to Heinz, and that had it known the truth about Heinz's misrepresentations it would not have issued the Policy, or would only have made the Policy available to Heinz on different terms.  For these reasons, Starr seeks to

**C. Heinz's History of Purchasing ACI Coverage (Prior to the Starr Application)**

5.  Prior to 2013, Heinz had purchased ACI coverage subject to a $20M Self-Insured Retention ("SIR").[19] Doc. No. 283, p. 173-74; J-104, p. 12. In 2013, as a cost-reduction measure, Heinz's new senior management elected not to purchase ACI. Doc. No. 283, p. 174; J-34 at HZ3296-97. In 2014, Heinz considered purchasing ACI again but, this time, with a materially lower SIR of $1M, $5M or $10M, and lower premium,[20] with Heinz's new Global Insurance Director, Ian Ascher, as the Heinz senior manager responsible for the process. Doc. No. 283, pp. 174-75.

**D. Heinz's 2014 Submission/Application for ACI to Starr**

6.  Aon, an insurance broker, working with Mr. Ascher, represented Heinz as its agent throughout the 2014 insurance application process and the purchase of the ACI policy. Doc. No. 283, p. 175.

7.  On Friday, May 30, 2014, Aon submitted an unsigned partial Application (prepared on a standard industry form, an "XL" Application Form) to Starr on Heinz's behalf, which did not include any required loss information. Doc. No. 283 p. 267-268; J-10. In its cover email, Aon stated that, "[w]e will provide updated loss information under separate cover." J-4 at STARR1489.

8.  Starr's initial evaluation of Heinz's Insurance Application was conducted by Starr underwriter Jill Peev. Doc. No. 284, p. 17. Beginning on Tuesday, June 3, 2014, Ms. Peev

---

rescind the Policy. 'Rescind' means to have the Policy declared void as if it never existed. Heinz denies that it made a misrepresentation of fact in its application or a misrepresentation due to omission or silence. Heinz further alleges that, even if it did omit or misrepresent facts in its insurance application, Starr did not rely on any such facts and would still have issued the same Policy to Heinz because the facts were immaterial. Heinz further alleges that Starr is precluded from asserting that the Policy is void based on Starr's own actions or failures to act." Doc. No. 218.

[19] *See supra* FN8.
[20] *See supra* FN10.

evaluated the information that Heinz had submitted at that time; conducted research on Heinz's website to better understand its business and attendant risks, the range of products sold by Heinz, and the geographic distribution of its production facilities; and began to prepare a summary underwriting analysis of the Heinz risk.  Doc. 284, pp. 17-20.

9.  On June 6, 2014, Bernie Steves and Jean McDermott-Lucey of Aon (as Heinz's agents) initiated a conference call with Ms. Peev and Starr's lead underwriter (Ms. Peev's supervisor), Christian Waeldner, to discuss Heinz's loss history and, importantly, the appropriateness of a $5M SIR (substantially less than the previous $20M SIR), desired by Mr. Ascher on behalf of Heinz.  Mr. Steves described Heinz's prior loss experience as very favorable and said that it justified the lower $5M SIR.  Mr. Steves said that Aon would provide an updated loss history and a lower ratio analysis that would support Heinz's request for this lower SIR.  Doc. No. 283, pp. 274-75.[21]

10.  Later that day, Aon (again, on behalf of Heinz) sent to Starr the completed and signed Application for the ACI policy, including the "updated" loss history, and Aon's loss ratio analysis.  J-10.  The "updated" loss history disclosed only one loss (in the amount of $10,807,855) in excess of $5M (the amount of Heinz's desired SIR) over the prior 10 years.  Doc. No. 283, p. 278; J 10 at STARR3878.  Using the information contained in Heinz's "updated" loss history, the Aon loss ratio projected only one loss – a loss of $5.8M – in excess of a $5M SIR over a 10-year period.  Doc. No. 283, p. 281-82; J-10 at STARR3879.  The loss ratio analysis was captioned "Heinz Analysis 6/5/14."  *Id.*

[21] A loss ratio analysis compares expected premiums and expected losses over a multi-year period in the future (here, 10 years).  This analysis is used by insurers and insureds to evaluate the economics of policy terms and a prospective insurance relationship.  Doc. No. 283 pp. 285-288; *see e.g.* J-25.

11.  Importantly, the Heinz Application stated:  "All questions must be answered fully.

Please attach additional sheets if more space [is] required."  J-10 at STARR3872.

12.  Question 11a asked:

> In the last 10 years has the Applicant experienced a withdrawal, recall or stock recovery of any products or has the Applicant been responsible for the costs incurred by a third party in recalling or withdrawing any products, whether or not insured or insurable under an accidental and malicious contamination policy?

Heinz did not check either "Yes" or "No," but attached the "updated" loss history in response to

Question 11a.  J-10 at STARR3876, 78.

13.  Question 6e of the Application asked:

> Has the Applicant, its premises, products or processes been the subject of recommendations or complaints made by any regulatory body, internal or third party audit over the past 12 months or have any fines or penalties been assessed against the Applicant by any food or similar regulatory body over the last 3 years?

Heinz responded:  "NO."  It did not explain, or qualify, its answer.  J-10 at STARR3874.

14.  Heinz's completed Application included a Certification signed by Mr. Ascher, Heinz's

Group Leader – Global Insurance, dated May 28, 2014.  On behalf of Heinz, Mr. Ascher

certified, that the "statements set forth [in the Application] or attached hereto are true and that no

material information has been withheld"; that Heinz "agrees and acknowledges that its duty

without limitation is to disclose [to Starr] any and all matters material to the underwriting . . . ";

and that Heinz would "inform the Underwriters of any material alteration to the risk" that

occurred up to the time the Policy became effective.  Doc. No. 283, pp. 183-85; J-10 at

STARR3876.

### E.  Heinz's False and Misleading Statements in the Application

15.  At trial, Mr. Ascher unconvincingly attempted to minimize his involvement in the

application process and tried to shift responsibility to others.  As argued in Heinz's proposed

Findings of Fact No. 9 (doc. no. 280), "Heinz's new Global Insurance Director, Ian Ascher, had

been working at Heinz for four months when the Application was provided to the market in May 2014." Doc. No. 283, p. 217:4-23; J-4. Heinz argued that Mr. Ascher completed the portions of the Application that he could, looked to others for additional information to the extent available, and expected questions from the insurers if they required any further information to write the coverage. *Id.* at 217:24-219:11, 223:3-226:4. However, at trial, Mr. Ascher was not believable. His demeanor and evasiveness added to his loss of credibility. It was not credible that, as Global Insurance Director, he was without knowledge as to what information was required by the clear and unambiguous language of this standard Application form, commonly used in the industry, and thus he had to rely upon others to fulfill his responsibilities.

16. Mr. Ascher further unconvincingly and without credibility attempted to avoid responsibility for the Certification, by arguing his answers in the Heinz Application were only "to the best of his … knowledge and belief"; that "the certification did not extend to non-responses and blank portions of the [A]pplication that were left unanswered"; the Application was "as is"; and "effective on May 28, 2014." *See* Doc. No. 280, Heinz's Proposed Findings of Fact 15-25. Mr. Ascher ignored that the Certification stated that Heinz's "statements set forth [in the Application] and attached hereto are true and that no material information has been withheld[.]"

17. Mr. Ascher's Certification that "no material information has been withheld" was false. Although he certified that Heinz had a "duty without limitation to disclose [to Starr] any and all matters material to the underwriting," Mr. Ascher intentionally failed to do so. Based upon the Court's ability to evaluate Mr. Ascher's testimony and demeanor, the Court finds that Mr. Ascher intentionally and falsely answered the questions in the Application, so as to increase the

likelihood that Starr would agree to the substantially lower SIR ($5M instead of $20M) at a price attractive to Heinz.

18. Equally unconvincing were Heinz's efforts at trial to show that Starr had, or should have obtained sufficient knowledge of the misrepresented information from other previous application(s), or a few sentences in the approximate 200 page 10-K of Heinz, or news release(s) relating to Heinz's loss(es) in other earlier situations.

### F. Underwriting Process by Starr and the Issuance of the ACI Policy

19. The underwriting process followed by Starr, and the resulting issuance of the ACI Policy, according to the convincing testimony, was proper and standard in the industry, while arguably not perfect. In hindsight, Starr may have been too trusting of Heinz's past excellent reputation or may have been eager to have Heinz as a client. However, Starr properly relied upon the representations of Heinz in the application process coupled with the Certification. The testimony offered by Heinz to shift its failure to disclose and its blatant misrepresentations in the application process was not credible.

### G. Intentional, Material Misrepresentations by Heinz

20. Based upon the credible testimony, Heinz intentionally failed to disclose the following material losses:

    a. The 2014 China Nitrite Loss ("the biggest crisis we ever had in the China business" Doc. No. 283, p.113; J-64);

    b. The 2013 China Mercury Loss, (the fine by the Chinese government Doc. No. 283, p.101, J-55 at H29520);

    c. The 2008 Listeria Loss (by citing the total loss amount as "-" or "null" instead of as $12.7 million Doc. No. 283, p. 261; J-51); and

      d.  Three smaller 2014 losses in New Zealand and Canada.  Doc. No. 283, pp. 122-
126.

21.  Not only did the language of the Application require the foregoing to be disclosed, but
the testimony relating to the facts surrounding these losses convincingly demonstrated these
losses should have been disclosed, and were material in general, and would have been material to
Starr's underwriting analysis in particular.

22.  Heinz also intentionally and falsely answered Question 6e of the Application when it
certified that it had not been assessed any fines or penalties for the prior 3 years or "been the
subject of recommendations or complaints made by any regulatory body . . . " for the prior 12
months.  J-10.

23.  The trial testimony, supposedly supporting Heinz's elaborate, tedious, and belabored
attempt to avoid the impact of its misrepresentations, including:  providing loss history "dated
'as of' May 1, 2013' "in lieu of" a response to Question 11(a)"; adding "15 years of loss data,
rather than 10 years" as requested by Question 11(a) (while not disclosing the most current and
timely material loss history); citing Starr's internal directives on underwriting procedures;
insisting Starr had the burden to question "Aon's loss ratio analysis"; arguing that Starr issued
policies to other clients (albeit, generally existing clients) with allegedly less information;
alleging that Starr would not consider the misrepresented matters to be material; and that the
various non-disclosed losses were not required by the Application to be disclosed, and/or were
not material despite the clear and unambiguous language of the Application to the contrary;
instead of answering "yes" or "no", leaving the answer blank; instead of filling in the actual
amount of a loss in millions to indicate the loss as "-"; attempting to "add" language to
unambiguous questions and/or answers to justify a false or incomplete answer; - - was not

credible. The witnesses' testimony either did not support these contentions or it was simply not believable. *See* Doc. No. 280, ¶¶ 18-48.

24. In June of 2014, when Mr. Ascher sought to convince Heinz's senior management that it would be prudent to again obtain ACI coverage, Mr. Ascher provided to Heinz's senior management the very same loss information that he failed to disclose to Starr. His presentation included a list of historical losses sustained by Heinz in excess of $1,000,000. The list included the 2008 Listeria Loss - - but the loss amount presented to Starr was "-", not a "$12.7M loss." The historical loss list also included, under "Various Events," the amount of $12M (the China Nitrite and Canadian losses totaled approximately $12M). Doc. No. 283, p. 204, 243-244; J-37.

25. Heinz never offered any credible trial testimony as to how Mr. Ascher was able to "find" or "discover" this material information for the presentation to Heinz senior management but could not "find" or "discover" the same information for the Starr Application; nor why the loss information was not sufficiently material to disclose to Starr, but sufficiently material to provide to Heinz senior management for its analysis of whether to purchase the ACI coverage again.

**H. No Waiver by Starr in the Underwriting Process**

26. Heinz presented no credible evidence that Starr somehow waived the right to rescind the ACI policy during the underwriting process - - in particular, that Starr should have in essence not believed the Heinz statements and Certification, and thus should have performed more follow-up inquiries with Aon or Heinz. Doc. No. 280, Finding of Fact 19.

27. To the contrary, the credible evidence established that Starr obtained sufficient information from Heinz/Aon and the application process, if accurate and complete, to make a proper underwriting decision. Starr's expert witness and testimony of the Starr underwriting personnel credibly established this fact.

28.  While the decision of Starr to issue an ACI policy with only a $5M SIR, in hindsight, would not have occurred if the accurate and complete information had been provided by Heinz/Aon, no convincing evidence was presented that Starr waived its right to rescind because it trusted and relied upon the material misrepresentations of Heinz.  The credible evidence established that Starr would not have issued the ACI policy with the $5M SIR if Heinz had been truthful and forthcoming with accurate and complete information.

### I.   No Unreasonable Delay by Starr to Seek Rescission of the ACI Policy

29.  Based upon the record in the case and the credible testimony, at no time prior to the commencement of this lawsuit by Heinz, did Starr have sufficient facts to justify seeking the remedy of rescission.  In fact, at the time of the filing of the lawsuit by Heinz, Starr had not even completed its investigation into the veracity and completeness of the Heinz statements.  Doc. No. 280, ¶¶ 64-79.  If Starr had sued Heinz for rescission at any time before the Heinz lawsuit, and before Starr completed its investigation, undoubtedly Starr would have faced further allegations related to a bad faith claim from Heinz.[22]

30.  While Heinz's "industry" expert (Mr. Bendure) discussed some general theories of post-claim underwriting (whereby an insurance company purportedly waits to do proper underwriting analysis until a claim is filed), he never credibly tied these "theories" to the facts of this case. Heinz offered no credible evidence that Starr ever engaged in so-called post-claim underwriting in general, nor in this situation in particular.  In fact, the only credible evidence regarding Starr's general claim-processing practices was that Starr had never sought rescission of any policy before the Heinz ACI policy despite having issued thousands of policies.  Having now heard the testimony, the Court believes that Heinz's expert's theories and testimony would likely not have

---

[22] The Court notes that Heinz asserted a "bad faith" claim in this lawsuit.  Doc. No. 1, Count III.

survived a *Daubert* challenge. *Daubert v. Merrell Dow Pharmaceuticals, Inc*. 509 U.S. 579 (1993); *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999).

31. The record is clear that Starr patiently and methodically, on its own and through third-party claims investigators Charles Taylor and RGL, sought to gather information. Once Starr's claims personnel, Ms. Kelleher, determined that Heinz had failed to disclose the China Nitrite loss in the application process and the other material Heinz losses/fines, Ms. Kelleher reasonably asked Heinz why the China Nitrite loss had not been disclosed. J-152. Instead of providing a meaningful explanation, Heinz initiated this litigation, on the very same day that Ms. Kelleher wrote the second follow-up letter to Heinz (May 14, 2015).

## IV. ADDITIONAL CONCLUSIONS OF LAW

### A. Starr Met Its Burden of Proof

32. Starr established by a preponderance of the evidence that Heinz made one or more false statements of past or present fact in its Application for insurance. Doc. No. 125 pp. 3-4; N.Y. Ins. Law § 3105.

33. The credible evidence not only demonstrated that these undisclosed losses were material and would have substantially impacted Starr's underwriting analysis, but these losses were material to Heinz itself in its desire to purchase this ACI again. The misrepresentations made by Heinz were material because "knowledge by the insurance company of the misrepresented fact[s] would have led the insurer not to issue the same policy on the same terms it did." Doc. No. 125 pp. 3-4; N.Y. Ins. Law § 3105.

34. Starr proved by a preponderance of the evidence that Heinz's answer to Question 6e of the Application - - that it had not been assessed any fines or penalties for the prior 3 years or "been the subject of recommendations or complaints made by any regulatory body . . . " for the

prior 12 months - - was a materially false statement in response to a question asked by Starr.  *See* Doc. No. 125 pp. 3-4.

35.  Starr proved by a preponderance of the evidence that Heinz's incomplete answer to Question 11a of the Application - - in which Heinz intentionally omitted material loss history - - was a materially false statement in response to a question asked by Starr.  *See* Doc. No. 125 p. 3-4.

36. Starr did not need to prove by clear and convincing evidence that Heinz failed to disclose material information, because Starr specifically requested all of the information misrepresented by Heinz.  *Cf.*  Doc. No. 125 pp. 4-5 ("An insured has no duty under New York law to volunteer information which has not been requested and nondisclosure of such information will only void an insurance policy in instances where the insured sought to defraud the insurer by failing to disclose the information.").

### B.  Heinz Did Not Prove Its Affirmative Defense of Waiver

37.  Heinz did not prove by a preponderance of the evidence that Starr had sufficient knowledge of the misrepresented facts prior to issuing the policy.  Doc. No. 125 p. 5; Doc. No. 266 pp. 24-25; *see also U.S. Life Ins. Co. in City of New York v. Blumenfeld*, 938 N.Y.S.2d 84 , 86 (N.Y. App. Div. 2012) ( "[K]nowledge which is sufficient to lead a prudent person to inquire about the matter, when it could have been ascertained conveniently, constitutes notice of whatever the inquiry could have disclosed, and will be regarded as knowledge of the facts.").

38.  Heinz did not prove by a preponderance of the evidence that Starr failed to promptly assert rescission of the Policy after gaining sufficient knowledge of grounds for rescission.  Starr did not learn of Heinz's misrepresentations in its Application until April of 2015,[23] and then took

---

[23] Although the evidence shows that Charles Taylor and RGL - - third party claims investigators - - learned of the events and losses Heinz misrepresented in its Application in January of 2015, that

reasonable steps to fully investigate the potential grounds for rescission of the policy and sought to rescind the policy promptly. Doc. No. 266 p. 23; *see also Chicago Ins. Co. v. Kreitzer & Vogelman*, 265 F. Supp. 2d 335, 344 (S.D.N.Y. 2003)(when an insurer is determining whether it should seek to rescind a policy, an investigation of several months is not unreasonable).

## V.     CONCLUSION

The Court employed the use of an advisory jury with the purpose of providing insight into the facts underlying the Counterclaim for Rescission. The advisory jury has provided this insight in a thorough and thoughtful manner. The Court, however, is keenly aware that pursuant to its equitable powers, it maintains the ultimate responsibility to resolve claims and counterclaims of an equitable nature. The Court also recognizes that the decision to void an insurance contract *ab initio* is not to be taken lightly. *Ingrassia v. Medical Malpractice Ins. Assn.* 161 A.D.2d 685 (N.Y. App. Div. 1990), *citing Aetna Cas. & Sur. Co. v. O'Connor*, 8 N.Y.2d 359, 170 N.E.2d 681 (N.Y. 1960); *Medical Malpractice Ins. Assn. v. Brooklyn Hosp.*, 70 A.D.2d 552 (N.Y. App. Div. 1989); *see also Rushing v. Commercial Casualty Ins. Co.*, 251 N.Y. 302, 305, 167 N.E. 450; 17 Couch, Insurance § 67:230, 2d ed.; 69 NYJur2d, Insurance, § 830) ("Courts have disfavored rescission of insurance policies *ab initio* upon a recognition that there is a public interest at stake that exceeds the interests of the parties to the contract").

The Court finds that this case, based upon the facts that were fully developed at trial, warrants this extraordinary equitable remedy. *Robinson v. Sanctuary Record Groups, Ltd.* 826 F.Supp.2d 570 (S.D. N.Y. 2011), *citing Krumme v. WestPoint Stevens, Inc.,* 238 F.3d 133, 143 (2d Cir.2000) (internal quotation marks omitted) ("Under New York law, [r]escission is an

---

knowledge cannot be imputed to Starr, because the claims investigator agents had a limited purpose which did not include underwriting or investigating grounds for rescission of the policy. Doc. No. 266 p. 27. In any event, the time period between January of 2015 and June 16, 2015 when Starr filed its Counterclaim for Rescission is not sufficient time to show that Starr waived its right to rescind the policy due to unreasonable delay. Doc. No. 266 p. 23; *Kreitzer & Vogelman*, 265 F. Supp. 2d at 344.

extraordinary remedy . . . "). As the advisory jury found, Starr has adequately demonstrated that Heinz made material misrepresentations, misrepresentations that this Court finds were intentional, and this Court finds that Heinz has fallen short on carrying its burden of proof on the affirmative defense of waiver.

For all of these reasons, the Court will exercise its equitable discretion to void the policy *ab initio*. Judgment on Starr's Counterclaim for Rescission will be GRANTED. An appropriate Order follows.

**SO ORDERED** this 1st day of February 2016.

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:     All Registered ECF Counsel and Parties